# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Agri-Fine, Inc. | ) | Case No. 15-41000 |
| | ) | |
|     Debtor. | ) | Honorable Timothy A. Barnes |
| | ) | |

---

**DECLARATION OF ERIKSEN HOELZEMAN IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION & FIRST DAY MOTIONS**

---

I, Eriksen Hoelzeman, hereby declare under penalty of perjury:

1.       I am the Vice President of Agri-Fine, Inc. ("*Debtor*").

2.       I submit this declaration ("*Declaration*") in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code ("*Bankruptcy Code*") and (b) various motions filed concurrently herewith, including various "first day" motions (collectively, "*First Day Motions*"). I am over the age of 18, competent to testify, and authorized to submit this Declaration in support of the Debtor's chapter 11 petition and the First Day Motions described herein.

3.       As Vice President of the Debtor, I am familiar with the Debtor's day-to-day operations, financial condition, business affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management or the Debtor's advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration.

4.      This Declaration is divided into three parts. Part I of this Declaration provides an overview of the Debtor's business and operations, including its corporate and capital structure. Part II describes the circumstances leading to the commencement of this chapter 11 case. Part III set forth the relevant facts in support of the Debtor's First Day Motions.

## PART I: THE DEBTOR'S BUSINESS AND OPERATIONS

**A.      The Chapter 11 Filing**

5.      On the date hereof ("*Petition Date*"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

**B.      Overview of the Debtor's Business and Corporate Organization**

6.      The Debtor is a family-owned business, founded in 1984 by my grandfather, James Hoelzeman, who had years of experience in the fats and oils industry.

7.      My grandfather brought in his son (my father) Michael, to lead the construction of the Debtor's processing plant on Chicago's southeast side. Michael assumed ownership of the business in 2007. That same year, I became the third generation to join the family business.

8.      The Debtor was formed for the primary purpose of manufacturing an all-vegetable, virgin oil, from a co-product called soapstock, for use as highly nutritional, all-vegetable ingredients for the livestock feed industry.

9.      Soapstock is an oil-water emulsion that arises during the centrifuge stage of the food-oil refining process (primarily corn, canola, and soy). Agri-Fine acquires soapstock from refineries across North America, and then acidulates it.

10.     Acidulation is a process by which the emulsion is "cracked" by adding sulfuric acid. Through a proprietary process, the Debtor's acidulation of the soapstock produces a pure vegetable oil which is used in the livestock feed, chemical and bio-diesel industries.

11.     As part of the acidulation process, the Debtor also produces two other products: (a) an "interphase" material, which is another livestock feed ingredient; and (b) a high-phosphate water that can be used as excellent land fertilizer (or safely disposed of into Chicago's waste water system).

12.     The Debtor employs chemists at its on-site laboratory to perform regular testing to ensure that the products meet buyer specifications and exceed industry standards.

13.     The Debtor's oil product comes from high-quality source material and is one of the few guaranteed pure vegetable oil-based products on the market. This is in contrast to many competitors' products, which originate from restaurant grease (used to cook fish, chicken, pork, and beef) or from distiller's corn oil, which is extracted from fermented distillers' dried grains with solubles ("*DDGS*") (which can contain harsh chemicals and wax). The Debtor's products are also American Feed Industry Association ("*AFIA*") "Safe Feed/Safe Food" certified.

14.     The Debtor has never strayed from its beginnings as a family business, inspiring loyalty from its first customers and suppliers. The Debtor built its reputation for quality and service while its manufacturing capabilities grew. In turn, more customers and suppliers came to value the Debtor's industry experience, personal attention to detail and logistical expertise.

15.     Over the past 30 years, the Debtor has grown to become the largest producer of acidulated soapstock in the United States. When our plant first opened in 1985 it did so with four processing reactors, six storage tanks, and ten railcars.

16.     In 1994, the Debtor completed its first facility expansion, which added six processing reactors, sixteen storage tanks, and fifteen rail cars.

17.     Beginning in 2008 and phased over the course of five years, the Debtor undertook an even larger expansion and renovation of the plant facility, which resulted in a doubling of the plant capacity from 1500 tons per week to 3000 metric tons per week.

a.   The Debtor completely overhauled its processing building, removing and replacing the original ten processing reactors, and installing 24 new fiberglass processing reactors, together with associated building, plumbing, electrical, and processing infrastructure.

b.   The Debtor constructed four new raw material feedstock storage tanks (at 178,000 gallon capacity each), installed one additional 250,000 gallon raw material storage tank, and increased its finished oil storage capacity by 200,000 gallons. To increase logistical efficiencies, the Debtor also constructed a railroad unloading system, capable of servicing up to nine railroad cars at a time, and a three-bay truck unloading system, together with both rail and truck scales.

c.   The Debtor also installed a custom-designed load-out system connected to both the railroad and truck systems.

d.   Finally, the Debtor also designed and constructed a state of the art quality control laboratory with a gas spectrometer and other equipment used to analyze samples and assure the quality of inbound raw material and outbound product.

18.     This massive five-year expansion and renovation was completed in September 2013, after which point, the Debtor was the largest producer of acidulated soapstock in the United States, with over 3,000,000 pounds of daily raw material processing capacity, 1,000,000 pounds of daily finished product, more than 250 leased rail cars in its fleet, and 15,000 tons of tank storage.

19.     The Debtor has taken extensive actions to ensure that its manufacturing process and plant are clean and harmless to its employees and neighbors.

a.   For example, the Debtor has installed a multi-tank scrubber system on all of its processing tanks to scrub all emissions from those tanks, and has further expanded that scrubbing system to cover a majority of its storage tanks.

     b.    The Debtor installed state-of-the-art enzyme-based odor-eliminating misters along the entire fence line of the western perimeter of the Debtor's property (the side of the property where the railroad cars are unloaded).

     c.    The Debtor also added those enzyme misters to the top of its scrubber stack, as an added level of control.

     d.    In order to closely monitor conditions and determine what appropriate additional precautions may be appropriate, the Debtor installed a weather system to monitor wind direction, temperature and humidity conditions.

     e.    Moreover, the Debtor also implemented strict housekeeping and cleaning procedures for its facility that all employees are trained and required to follow.

20.    The Debtor acquires its raw material from vegetable oil refineries across North America, from as near as the Chicago suburbs to as far as Alberta, Canada.

21.    Debtor's logistical experience and massive leased rail fleet provided a significant competitive edge, ensuring that Debtor's suppliers could safely and timely move their soapstock from their refineries to Debtor's processing plant. Thus, the Debtor has eliminated the need for the refineries to use their own rail cars to transport the raw material.

22.    The Debtor is also a conscientious green business. The very heart of its business – recycling oil co-products into reusable animal feed ingredients – is based on sustainability, and this green mindset impacts everything it does.

23.    The Debtor carefully selects source material to ensure there are no chemical contaminants or animal co-products.

24.    The recent renovation of the Debtor's plant included the installation of state-of-the-art "green" technology, such as highly efficient air compressors, steam generators and "smart lighting," reducing the Debtor's overall energy consumption by 20 percent. Notably, its plant was the first fully LED-lighted industrial facility in Chicago.

C.      **Pre-Petition Capital Structure**

25.      The Debtor has three separate business loans from Standard Bank and Trust Company ("*Standard*").

26.      On June 14, 2012, in connection with the purchase of certain equipment for its chemistry laboratory, the Debtor obtained financing from Standard in the original principal amount of $270,000, in the form of a 60-month term loan, with a maturity date of July 5, 2017 ("*2012 Term Loan*").  As security for payment and performance of the Debtor's obligations in connection with the 2012 Term Loan, the Debtor signed a Commercial Security Agreement dated June 14, 2012, providing Standard with a security interest in the Debtor's personal and fixture property.

27.      On October 5, 2013, in connection with the expansive plant renovation and expansion, the Debtor obtained financing from Standard in the original principal amount of $3,650,000, in the form of a 60-month term loan, with a maturity date of October 5, 2018 ("*2013 Term Loan*"), memorialized by a Business Loan Agreement.  As security for payment and performance of the Debtor's obligations in connection with the 2013 Term Loan, the Debtor executed and delivered a Commercial Security Agreement dated October 5, 2013, providing Standard with a security interest in the Debtor's personal and fixture property.

28.      To further secure payment and performance under the 2013 Term Loan, the Debtor executed and delivered to Standard a Mortgage and Assignment of Rents dated October 5, 2013, granting Standard a security interest in certain real property owned by the Debtor, commonly known as 2701 E. 100th Street, Chicago, IL 60617.

29.      Also on October 5, 2013, in connection with a need for additional liquidity for business operations including purchase of inventory and financing of receivables, the Debtor

obtained financing from Standard in form of a revolving loan (line of credit) with a renewable

one-year term, in the maximum amount of $3,500,000 ("*2013 Revolver*").

30.     All of the relevant Standard loan and security documents contain cross-

collateralization provisions.

31.     As of November 13, 2015, the outstanding balances on the obligations were:

   a.  2012 Term Note: $97,992.53;

   b.  2013 Term Note: $2,695,444.27;

   c.  2013 Revolver: $3,499,990.00.

**D.     The Other Hoelzeman Family Owned Entities and Intercompany Activities**

32.     In addition to the Debtor, the Hoelzeman family owns five other companies, each

of which does business with the Debtor on an arms-length and commercially-reasonable basis:

   a.  Ag Valley Railroad, LLC ("*Ag Valley RR*"). Ag Valley RR is a fully
       functioning Class III (short-line) railroad. It earns revenues in providing
       switching services to its customers (including the debtor) and storing
       railroad cars. Its switching services are billed to the class 1 railroads who
       pay Ag Valley RR per the tariff. Ag Valley RR also owns and operates a
       police department that provides security services to the railroad, the
       Debtor, and another related entity, Agri-Transit (defined below). Ag
       Valley RR charges the Debtor a pro rata amount for those security
       services. The Debtor is not current on its obligations to Ag Valley RR.

   b.  Ag Valley Holdings, LLC ("*Ag Holdings*"). Ag Holdings owns and leases
       the land on which Ag Valley RR operates. The monthly rent charged to
       Ag Valley RR is exactly the cost of Ag Holdings' mortgage payment. Ag
       Holdings has no other sources of revenue or expense.

   c.  Agri-Transit, LLC ("*Agri-Transit*"). Agri-Transit is an operating trucking
       company, with van trailers, tank trailers, and leased trucks. The Debtor is
       one of Agri-Transit's customers, but represents only a relatively small
       percentage of Agri-Transit's total revenues with the vast majority coming
       from unrelated third parties. The Debtor pays market rates when using
       Agri-Transit's services. The Debtor is not current on its obligations to
       Agri-Transit.

d.  Irondale Leasing, LLC ("*Irondale*"). Irondale owns certain mobile equipment and trailers, which it leases to the Debtor, Agri-Transit, and Ag Valley RR to use in their respective operations. The Debtor is not current on its obligations to Irondale.

e.  Agri-Fine International, LLC ("*A-F International*"). A-F International is an interest charge domestic international sales corporation ("*IC-DISC*"), a vehicle for export tax savings for the Debtor. A-F International was created in conformity with applicable Internal Revenue Code provisions. When the Debtor makes an international sale, it can pay up to a 50% commission to A-F International. The commission is expensed by the Debtor, reducing its taxable ordinary income. A-F International is tax-exempt and not taxed on the commission income. A-F then pays dividends which are taxed at a substantially lower rate than the taxable rate on the Debtor's ordinary income. While the commissions are paid on an annual basis at the end of each calendar year, the Debtor determines the commission and accrues that amount for book purposes on a monthly basis. As of September 30, 2015, the accrued commissions totaled $772,040.82. No commissions to A-F International have been paid in 2015.

## PART II: EVENTS LEADING TO THE CHAPTER 11 CASE

33.  As elaborated below, the Debtor's need to file this chapter 11 case has resulted from  multiple events largely outside of the Debtor's control, all happening at approximately the same time, including: (i) a precipitous drop-off in commodity prices; (ii) already unfavorable rail car lease terms becoming onerous due to a "perfect storm" of adverse market conditions; (iii) a high-volume supplier turning into a direct competitor; (iv) a lawsuit for injunction and penalties by the Illinois Attorney General, filed at the request of the Illinois EPA, followed by private party class action, based on environmental complaints; and (v) litigation involving other private parties.

**A.     Precipitous Decline in Commodity Prices Hampered Debtor's Ability To Obtain Sufficient Quantities of Raw Soapstock From Suppliers**

34.     Beginning in 2014 and continuing through 2015, commodity prices have declined to lows not seen in the agricultural industry in more than a decade, decreasing the price of both the Debtor's raw soapstock material sold by its supplier, as well as the price the Debtor could command from its customers on its finished products.

35.     At the same time that commodity prices have been dropping, the freight and shipping costs for those commodities has remained steady. Combined, the precipitous drop in the price of the raw material has caused the cost of freighting the soapstock from many of the Debtor's suppliers to be in excess of value of the soapstock itself.

36.     In other words, the Debtor or the supplier (depending on who was responsible for the freight costs) was losing money with each shipment of soapstock.

37.     This imbalance in the cost of raw material and shipping caused many of the Debtor's prior regular sources of soapstock to no longer be viable options, greatly decreasing the Debtor's ability to obtain a sufficient amount of soapstock to properly run its operations.

38.     Indeed, this drying up of raw materials happened just after the Debtor completed the massive renovation and expansion of its plant and, consequently, at no time has the Debtor's new state-of-the-art plant been able to operate at full capacity. In fact, in the six months leading up to the filing of this chapter 11 case, the Debtor averaged only 20-30% production capacity.

**B.     Due to the Drop in the Viable Supply of Soapstock and Decrease in Production, Debtor is Over-Burdened With Onerous Lease Obligations for Railroad Tank Cars**

39.     Consistent with the industry, the Debtor does not own its railroad tank car fleet outright, but rather leases its fleet from various tank car leasing companies. Those tank car leases generally run for either three or five year terms.

40.     In 2007, with the beginning of the expansion and renovation of the plant, and in order to keep up with the consistent growth of its production, the Debtor needed to begin adding to its number of tank car leases. In addition, the majority of the Debtor's existing leases expired and were renewed in 2008 and 2009, causing their terms to extend to 2012-2014.

41.     As tank car leases were expiring in 2012-2013, continued political fighting delaying the construction of the Keystone XL pipeline forced the crude oil industry to increase its reliance on transportation of oil by railroad. This increased demand caused a national shortage of the tank cars used by the Debtor (and the oil industry).

42.     This shortage in turn allowed tank car lessors to massively inflate the monthly price per car on leases, more than doubling over the prior average rate.

43.     Thus, the Debtor's monthly lease rates increased from a monthly average of $550 per car to over $1100 per car, and in some cases, over $1400 per car.

44.     In an attempt to bring leasing costs down, the Debtor entered into the shortest lease renewal terms possible, and began making plans to have railroad cars built and leased to Debtor individually by TrinityRail. By commissioning construction and guaranteeing leasing in this manner, the Debtor was able to negotiate a substantially lower monthly lease rate ($995 per car), though there was a two-year lead time on delivery of the railroad cars.

45.     Expecting that business would continue as in prior years, in April 2013, the Debtor commissioned an order of 150 railroad cars from Trinity Industries, with delivery of the cars starting in April 2015.

46.     The TrinityRail railroad cars began arriving at the Debtor's plant in April 2015. But, as set forth above, by April 2015, the drop in commodities pricing (without a corresponding drop in freight pricing), had left the Debtor in the position where it was not able to send as many

railroad cars as anticipated to pick up raw materials without losing money. Without a sufficient

supply of raw material, production slowed, leaving the Debtor with a reduced need for railroad

cars to ship finished products to customers. In short, the Debtor now has a glut of unused and

unnecessary railroad cars, for which it is paying approximately $100,000 per month.

47.    One of the critical purposes for the filing of this chapter 11 case is to allow the

Debtor to reject a substantial number of these now unnecessary and burdensome railroad car

leases.

**C.    In October 2014, Archer Daniels Midland Unexpectedly Transformed From a Regular Supplier to a Direct Competitor**

48.    Archer Daniels Midland ("*ADM*") is the one of the world's largest agricultural

processers and ingredient providers. It is headquartered in Chicago and is the largest vegetable

oil refinery operator in North America, with its largest refinery located in Decatur, Illinois, only

170 miles from the Debtor.

49.    ADM had been a consistent and significant (and geographically most proximate)

supplier of raw soapstock material to the Debtor since the first day the Debtor opened for

business in 1985. ADM was fully aware of the Debtor's plant expansion. ADM supported the

expansion, with representatives telling the Debtor's employees that the Debtor could expect to

continue to purchase ADM's soapstock, in fact stating that the raw material supply amounts

could grow along with the Debtor's manufacturing capacity.

50.    Yet in December 2013, only a few short weeks after the Debtor had finally

completed the extensive renovation and expansion of its plant, ADM announced a plan to build a

competing acidulation plant at its refinery in Decatur.

51.    ADM's construction of a soapstock acidulation plant in Decatur was doubly

damaging to the Debtor.

52.     First, by acidulating its own soapstock, ADM is no longer a supplier of raw material to the Debtor. This supply loss has been especially devastating, as ADM was Debtor's closest refinery, meaning that freight costs from ADM were the lowest of all of Debtor's suppliers.

53.     Second, ADM is now also a direct competitor of the Debtor in terms of customers who buy the finished acidulated products.

54.     ADM also has the ability to come in with pricing on its product that is below-market because, with the acidulation plant on the same premises as the refinery, ADM does not incur any inbound freight expense for the raw soapstock materials. Since the opening of the competing facility, the Debtor has in large part lost its largest customer to ADM (formerly shipping 750,000-1,000,000 pounds per week, now down to zero-400,000 pounds).

**D.     The Environmental Lawsuits Filed by the Illinois EPA and a Proposed Class of Private Citizens**

55.     Over the Debtor's past thirty years of operations, there have been periodic complaints from residents of the neighborhood near the Debtor's plant about unpleasant odors purportedly emanating from the Debtor's plant.

56.     It is the Debtor's understanding that in the past some residents lodged complaints with the City of Chicago's Department of the Environment ("*CDOE*"), which issued tickets to Agri-Fine for alleged odor violations.

57.     The Debtor was ticketed by CDOE on four occasions between June 2006 and February 2011, commencing four administrative proceedings.

58.     Each proceeding was resolved with CDOE and the Debtor entering into a Settlement Agreement and Mutual Release ("*SAMR*").   Under the SAMR's, the Debtor paid settlement amounts of $3,435.37, $1,000.00, $390.00, and $660.00, respectively.   The Debtor

made no admission of wrongdoing and there were no findings of wrongdoing by the City of Chicago.

59.     CDOE, which has been integrated into the Chicago Department of Public Health, continues to periodically inspect the Debtor's plant and surroundings for odors, but has never ticketed the Debtor since 2010.

60.     The Debtor is not the only industrial company in its neighborhood on the southeast side of Chicago to have environmental complaints lodged against it. For example, KCBX Terminals Company, a bulk purchaser and distributer of petcoke (a coal-like substance derived from the crude oil refining process), had a petcoke storage terminal less than one mile from the Debtor's plant.

61.     In August 2013, a windy day caused a dust storm of petcoke dust throughout the community. This caused some residents of the area to organize and protest, demanding attention and action by the City of Chicago, the Illinois EPA, and the Illinois Attorney General, and garnering activity by local and national environmental groups, including the Sierra Club.

62.     Following the KCBX petcoke problems, organized protesters attempted to create a link between the Debtor and petcoke in the minds of local residents. Notwithstanding the fact that the Debtor has nothing to do with petcoke and has never manufactured, processed, stored, or transported petcoke, the protesters were so successful in creating this false link that CBS News (Chicago) published (and later retracted) an incorrect report that the Debtor had been sued by the Illinois Attorney General to clean up its petcoke.

63.     Despite the inaccuracy, this connection to a known environmental problem with petcoke led to a marked increase in resident complaints about the Debtor's allegedly noxious odor emissions.

64.     On October 23, 2013, following an inspection of Debtor's plant, the IEPA served the Debtor with notice of purported statutory violations regarding odors, discharge and emission levels, and the failure by Debtor to obtain certain permits and comply with reporting requirements.

65.     Under intense pressure from a local political group and a group of local residents, IEPA referred the alleged violations to the Illinois Attorney General's office for a civil suit. The Attorney General's office brought a complaint, twice amended, alleging: air pollution due to odor emissions; failure to obtain certain construction and operating permits; failure to submit certain notifications and records; and failure to comply with certain "fugitive dust" particulate matter control and reporting requirements in the Debtor's parking lot ("*AG Lawsuit*").

66.     The Debtor has denied all material allegations raised by the AG Lawsuit, and has asserted affirmative defenses to each count of the AG. The AG has filed a motion to strike the Debtor's affirmative defenses, which is scheduled to be fully briefed by February 2016.  The Debtor has served interrogatories and document requests on the AG, to which responses are due December 10, 2015.  The AG has not served any discovery requests on the Debtor.

67.     Shortly before the filing the AG Lawsuit, the IEPA was invited to community meetings to discuss residents' complaints and what the IEPA planned to do to in response. Following the filing of the AG Lawsuit, representatives of the Attorney General's office would coordinate meetings together with community activists ostensibly for the purpose of talking with residents, but at the same time, handing out forms specifically urging additional written resident complaints. There was a notable lack of discussion or disclosure of any other local companies that may have contributed to any purported odor emissions (of which there are several).

68.     The AG lawsuit drew the attention of a Chicago plaintiff's class action law firm, Sneckenberg, Thompson & Brody, which associated with a Detroit-based plaintiff's class action firm law, Liddle & Dubin, which specializes in environmental class action litigation.

69.     Attorneys from these class action law firms began to attend neighborhood meetings organized by community activists.  Ultimately, representatives of the AG's office and the class action law firms appeared together at the same meetings, with the AG representatives urging the attendees to fill out form complaints against the Debtor and the Sneckenberg firm handing out fliers and survey forms.

70.     Eventually, the class action lawyers signed up five "class representatives" from the same block and filed a class action lawsuit (*Hurt v. Agri-Fine*) on June 4, 2015, alleging nuisance and negligence on the Debtor's part with respect to alleged odor emission preventing residents from private enjoyment of their property and damage to their health ("*Class Action Lawsuit*").

71.     The Debtor has not yet been required to file an answer to the complaint, but will deny all allegations therein. The proposed class has not been certified; indeed no motion to certify the class has even yet been filed.  The case is set for a status hearing on January 4, 2016.

72.     IEPA has previously stated that it will not settle without a consent decree, pursuant to which the Debtor would have to admit liability. The Debtor is unwilling to admit liability, both because it denies that such liability exists, and also because such an admission could be used affirmatively against the Debtor by the class action plaintiffs. The Debtor remains in active negotiations with the AG's office.

E.      **Other Pending Litigation Against the Debtor**

73.     In addition to the pending AG and Class Action Lawsuits, the Debtor is engaged

in several other lawsuits, and litigation costs and expenses have become increasing burdensome.

A brief recitation of these lawsuits follows:

> a.  *Agri-Fine, Inc v. Express Chem LLC*, et al., case no. 14 L 6574, pending in the
> Circuit Court of Cook County, Illinois: Debtor sued (i) Express Chem, one its
> vendors, for breaches of express and implied warranties due to the soapstock
> provided having an acceptably high moisture level, and (ii) Express Chem and a
> collection agency that it hired for tortious interference and libel in connection
> with one of the Debtor's customers. Defendants have denied the allegations and
> asserted counterclaims based on Debtor's failure to pay invoices related to the
> contested loads of soapstock. Debtor disputes and denies the counterclaim.
>
> b.  *GLNX Corp. v. Agri-Fine Corp.*, case no. 201401353, pending in the 190th
> Judicial District Court of Harris County, Texas: GLNX sued Debtor for breach of
> contract and negligence based on certain railroad car leases. Debtor disputes and
> denies the allegations.
>
> c.  *Progressive Protein, LLC v. Agri-Fine International, Inc.*, case no. CI 15-8847,
> pending in the District Court of Douglas County, Nebraska: Progressive Protein
> sued Debtor for breach of contract related to certain railroad car leases. Debtor
> disputes the allegations.

74.     By filing this chapter 11 proceeding, the Debtor obtains the protection of the

automatic stay, giving it relief from this other pending litigation, while it seeks to sell its business

as a going concern.

75.     The Debtor expects to file a motion to approve sale procedures within the first

three weeks of the chapter 11 case and is in the process of negotiating with a potential stalking

horse bidder.

## PART III: FIRST DAY MOTIONS AND ORDERS

76.      Concurrently with the filing of the chapter 11 case, the Debtor has filed the

following motions and, at the "first day" hearing, will seek orders approving the First Day

Motions and associated proposed orders (collectively, the "*First Day Orders*"), each as listed on the attached **Exhibit A**, and respectfully requests that the Court consider entering the proposed orders granting such First Day Motions.[1] I have reviewed each of the First Day Motions and First Day Orders (including exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions and First Day Orders is vital to the Debtor's ability to transition to, and operate in, chapter 11 with minimum interruption or disruption to business and resulting loss of value.

**A.       Cash Collateral Motion**

77.       The Debtor requests entry of interim and final orders pursuant to sections 105, 361, 362, 363, 507(b) and 552 of the Bankruptcy Code: (a) authorizing the Debtor's use of cash collateral ("*Cash Collateral*"); (b) granting certain adequate protection; (c) modifying the automatic stay to permit the Debtor to implement the terms of any orders approving the cash collateral motion; and (d) scheduling a final hearing for entry of an order authorizing and granting the relief requested in the cash collateral motion on a final basis.

78.       The Debtor's access to Cash Collateral is absolutely necessary to preserve and maximize value for the Debtor's stakeholders. The Debtor's use of Cash Collateral in the ordinary course of business is essential to ensuring smooth, continued operations, including procurement of goods and services from vendors, payment of its employees, and satisfaction of other working capital needs.

---

[1] Any term not defined herein shall be given the meaning assigned to it in the specific First Day Motion being described.

79.     Absent approval of the Interim Order, the Debtor will be unable to generate revenue, operate its business, pay the individuals who report to work each day, or fund its reorganization process, resulting in immediate and irreparable harm to the Debtor's estate.

80.     Immediate authority to use Cash Collateral as set forth in the Cash Collateral Motion and in its associated interim order is necessary to prevent immediate and irreparable harm to the Debtor's estate.

81.     The Debtor believes that the Lender will be adequately protected for the use of Cash Collateral by:

- replacement lien to the extent of diminution of value of the Collateral from and after the Petition Date;

- a superpriority administrative claim pursuant to Section 507(b) of the Bankruptcy Code to the extent of diminution of value of the Collateral from and after the Petition Date;

- preparation and submission of the Budget and related cash flow forecasts

- stipulation to the amount and validity of Standard Bank's prepetition claims and liens, subject only to the right of an official committee to challenge such claims and liens during the Investigation Period.

82.     The adequate protection lien granted to Standard Bank shall be a lien senior in rank and priority to Standard Bank's prepetition lien and all other liens against the Collateral, subject and subordinate only to the provided Carve Out.

83.     For all the foregoing reasons, I believe that the relief requested in the cash collateral motion is in the best interests of the Debtor's estate and will enable the Debtor to operate in chapter 11 without disruption.

**B.      Cash Management Motion**

84.     The Debtor requests entry of interim and final orders (a) authorizing the Debtor to continue using its existing cash management system, bank accounts, and business forms, subject

18

to any changes that the Debtor may make thereto in its sole discretion, and (b) waiving any applicable investment and deposit requirements imposed by Section 345(b) of the Bankruptcy Code or otherwise. The Debtor also requests that the Court schedule a final hearing on the Motion within forty-five (45) days of entry of the Interim Order.

85.     The Debtor maintains four separate commercial bank accounts (collectively, the "*Bank Accounts*") with Standard Bank and Trust Company ("*Standard Bank*").

- Main Account: The Main Account is the primary operating account. It receives all customer payments and miscellaneous cash receipts, and pays all vendor invoices. The Debtor also transfers funds from the Main Account to its Payroll Account, Freight Account, and Money Market Account on an as-needed basis.

- Freight Account: The Debtor relies heavily on rail road support in its business operations. The Debtor transfers funds from the Main Account to the Freight Account on an as-needed basis to support automatic draft withdrawals by UP Rail to pay rail freight invoices that are due 15 days from invoice date.

- Payroll Account: The Debtor transfers funds into the Payroll Account from the Main Account on at least a weekly basis to cover payroll. From this account, the Debtor's payroll service (PayChex) deducts funds to cover payroll, reserve or pay related tax obligations, and reserve or pay court-ordered wage garnishments for child support or similar court-ordered obligations. The Debtor maintains a minimum balance of $1,000 in this account.

- Money Market Account: The Debtor uses this as a savings account to backstop short-term overdraft situations in other Bank Accounts through electronic bank transfer. The Debtor replenishes this account as soon as possible following such an event. The Money Market Account earns a small amount of monthly interest.

86.     In the ordinary course, the Debtor accepts funds into, makes payments from, and transfers funds between the Bank Accounts on as as-needed basis (the "*Cash Management*

System"), in its business judgment, to meet its financial obligations and maintain and support its

business operations.

87.     The Debtor also regularly uses preprinted and company-specific business and

banking forms, including checks, letterhead, envelopes, invoices, purchase orders, bills of lading,

and other common forms, in the day to day conduct of its affairs (collectively, the "*Business

Forms*")

88.     In my opinion, requiring the Debtor to alter its Cash Management System,

including its use of Business Forms and its existing books and records, would cause disruption in

the Debtor's business and would impair the Debtor's efforts to focus on its chapter 11

proceedings and pursue options to maximize the value of its estate. Moreover, such actions

would be expensive, unnecessary, and burdensome to the Debtor's estate and disruptive to the

Debtor's business operations and would not confer any benefit upon those dealing with the

Debtor.

89.     Consequently, I believe that maintenance of the existing Cash Management

System and other banking and business practices during this chapter 11 case is in the best

interests of all creditors and other parties in interest.

**C.     Utilities Motion**

90.     The Debtor is requesting that this Court enter an order (a) implementing

procedures (in the form and matter discussed in the utilities motion) to provide adequate

assurance of postpetition payment to the Utilities, as that term is used in section 366 of the

Bankruptcy Code; (b) implementing procedures by which any Utility can request additional

assurance; and (c) prohibiting the Utilities from altering, refusing to provide, or discontinuing

service to or discriminating against the Debtor solely on the basis of commencement of the

chapter 11 case or on account of any unpaid invoice for services provided prior to the Petition Date.

91.    The uninterrupted provision of the utility services is vital to the Debtor's operation and thus the success of the chapter 11 case. In my opinion, it is critical that utility services continue uninterrupted during this chapter 11 case. I believe that the procedures the Debtor has proposed for the Utilities adequately protect the Utilities' rights that I have been advised are provided to the Utilities under the Bankruptcy Code, while also protecting the Debtor's need to continue to receive, for the benefit of its estate, the utility services upon which its business depends.

**D.    Insurance Motion**

92.    The Debtor requests entry of an order authorizing the Debtor to (a) continue its prepetition insurance coverage, (b) satisfy payment of prepetition obligations related to that insurance coverage in the ordinary course of business, and (c) renew, supplement, or enter into new insurance coverage in the ordinary course of business.

93.    In the ordinary course of business, the Debtor maintains multiple insurance policies providing coverage for, among other things:

- Health insurance;
- Dental and vision insurance;
- Life insurance;
- Property insurance;
- Boiler and machinery insurance;
- General liability;
- Crime;
- Automobile and commercial vehicle;
- Umbrella; and
- Pollution.

94.     Certain of the Insurance Policies (all except health, dental/vision, and life) are paid through a commercial premium finance agreement with First Insurance Funding, a Wintrust company.  Under the premium finance agreement effective as of April 1, 2015, the Debtor paid a $55,000 initial payment and has a monthly obligation of $23,317.76.  The terms of the Insurance Policies paid through the premium financing agreement began April 1, 2015 and such coverage is subject to renewal April 1, 2016.

95.     In order to continue operations, the Debtor needs its various insurance policies to remain in full force and effect, and needs to be permitted to continue paying the monthly premium financing obligations.

**E.      Employee Wages Motion**

96.     As of the Petition Date, the Debtor employs twenty-four (24) employees (each an "*Employee*" and collectively the "*Employees*"). Twenty-two (22) of the Employees are full-time employees and two (2) are part-time employees. Ten (10) Employees are paid a salary, and fourteen (14) are paid on an hourly basis.

97.     The Employees perform a variety of critical functions, including management and operation of the Debtor's plant, accounting, administration, finance, human resources, marketing, facilities maintenance, information technology, freight and shipping logistics, security, and other tasks. The Employees' skills, training, and knowledge and understanding of the Debtor's operations are essential to continuing operations and, ultimately, the effective reorganization of the Debtor's business.

98.     I believe that the vast majority of the Debtor's Employees rely exclusively on their compensation and benefits to pay their daily living expenses and provide for their households. These Employees (and their families) would be exposed to significant financial harm if the Debtor was not permitted to ensure uninterrupted payment of compensation

(including obligations related to benefits) and maintain other programs benefiting their Employees.

99.     To minimize the personal hardship that the Employees would suffer if prepetition Employee-related obligations were not paid when due or as expected, and to maintain morale and stability in the Debtor's workforce during this critical time, the Debtor is seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, ordinary-course raises and other pay increases, bonuses, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance, retirement health and related benefits, workers' compensation benefits, vacation time, leaves of absence, life insurance, short- and long-terms disability coverage and all other benefits that the Debtor has historically provided in the ordinary course of business (collectively, the "*Employee Compensation and Benefits*") and to pay all costs incident to the foregoing.

a.     <u>Employee Compensation</u>

100.     In the ordinary course of business, the Debtor incurs payroll obligations for its Employees. Such obligations generally consist of wages and salaries ("*Employee Compensation*").

101.     The Debtor's employees are paid salaries and wages on a weekly basis. Friday is payday for all employees with all payments made one week in arrears.

102.     Importantly, the Debtor does not owe any unpaid Employee Compensation in excess of the $12,475 cap imposed by section 507(a)(4) of the Bankruptcy Code. Accordingly, the Debtors are not seeking authority on an interim basis to pay unpaid Employee Compensation that exceeds $12,475 to any single Employee.

b.    Employment & Withholding Taxes

103.    The Debtor routinely withholds from its Employees' payroll amounts it is required to remit to various federal, state, and local taxing authorities and other governmental agencies (the "*Employee Deductions*", referred to collectively with Employee Compensation as the "*Employee Obligations*"). Examples of Employee Deductions include: Social Security Taxes; federal, state, and local income taxes; wage garnishments; and other court-ordered deductions. These taxes and other deduction obligations are usually calculated based on statutorily-mandated percentages of earned wages. The Debtor has historically paid all Employee Deductions, and by this motion, the Debtor seeks authority to continue doing so, and forward any outstanding prepetition Employee Deductions to the appropriate parties.

c.    Employee Benefit Programs

104.    The Debtor offers all of its full time Employees certain benefits, including health insurance, dental and vision insurance, a 401(k) profit sharing plan, term life insurance, short term disability insurance, and paid time off (collectively, the "*Employee Benefits*").[2] The Debtor seeks to continue providing the Employee Benefits postpetition, and to honor the all prepetition obligations related to the Employee Benefits.

i.    *Medical, Dental & Vision Benefits*

105.    As set forth in greater detail in the Wages Motion, the Debtor offers health care coverage, including dental and vision care, to approximately 19 full time Employees and their dependents.[3] The Debtor provides Employees a choice of five different health care plans: three PPO plans, and two HMO plans at the election of each Employee (the "*Health Insurance*

---

[2]    Salaried Employees are eligible to participate in the Employee Benefits immediately upon beginning employment with the Debtor; hourly employees are eligible for medical and dental coverage immediately upon beginning employment with the Debtor, and are eligible to participate in the 401(k) Plan on the first day of the month after being employed by the Debtor for 45 days.

[3]    The Debtor provides dental coverage only to one Employee.

*Plans*"), through Blue Cross/Blue Shield of Illinois. For each of the Health Insurance Plans, the Debtor funds a specific portion of the monthly premiums, depending on the type of plan and whether the participating Employee is hourly or salaried.

106.    In 2014, the Debtor paid approximately $291,234.00 for Employee health care benefits related to the Health Insurance Plans. The Debtor offers dental and vision care coverage through Principal Financial Group ("*Principal*"), funding 70% of each Employee's monthly premiums for dental coverage. In 2014, the Debtor paid approximately $20,825.00 for Employee dental benefits.

107.    I believe that the Debtor has paid all administrative costs that came due prepetition. To the extent any premiums due for the medical, dental, and vision benefits remained unpaid on the Petition Date, including any claims connected to these benefits, and so far as these premiums and claims relate to the prepetition period, the Debtor seeks authority to pay any outstanding amounts.

ii.    *Workers' Compensation Obligations & Related Insurance*

108.    The Debtor provides workers' compensation insurance for Employees at the statutorily-required level for each state in which it has business operations through Amerisafe, Inc. As of the Petition Date, the Debtor does not believe it owes any prepetition amounts on account of workers' compensation insurance. Out of an abundance of caution, the Debtor requests authority to pay any prepetition amounts outstanding for workers' compensation obligations.

iii.    *Life Insurance & Short Term Disability Coverage*

109.    The Debtor provides basic life insurance for all full time Employees through a premium-based insurance policy, through Principal. The Debtor also provides short term

disability coverage to all full time Employees. Short term disability coverage is premium-based, and fully paid by the Employer. As of the Petition Date, the Debtor does not believe it owes any prepetition amounts on account of life insurance or short term disability coverage. Out of an abundance of caution, the Debtor requests authority to pay any amounts outstanding for prepetition life insurance or short term disability obligations.

  iv.         *Paid Time Off*

110.    The Debtor provides all of its full time Employees benefits in the form of paid time off ("*PTO*"), in the form of vacation time, and PTO related to sick leave or bereavement.

111.    To ensure Employees have the opportunity to rest and rejuvenate, the Debtor provides Employees the ability to schedule paid time off for vacations, special days off, or alternative dates for celebrating holidays ("*Vacation Time*"). Vacation Time is available to all full time Employees, and is awarded annually beginning on January 1. For new employees, Vacation Time accrues at a prorated 3.33 hours per month, beginning during the first month of the Employee's employment with the Debtor. The amount of Vacation Time, measured in hours, is based on the number of years each Employee has worked for the Debtor.

112.    In addition, all of the Debtor's full time Employees receive 40 hours per year in PTO for illness or wellness reasons, bereavement, or jury duty ("*Wellness PTO*").

113.    The Debtor allows any Employee called to serve on a jury to do so, and receive payment for any days the Employee is serving on a jury as PTO. Time spent serving on a jury is paid from the Employee's PTO, with the Employee deducting these amounts from remaining Vacation Time or Wellness PTO, at the Employee's election. Employees may also accept fees paid by the respective court in which they serve as a juror for their time.

v.        *401(k) Plan*

114.    The Debtor maintains a qualified defined contribution savings plan for the benefit of all eligible Employees meeting the requirements of § 401(k) of the Internal Revenue Code (the "*401(k) Plan*"). Employees may contribute elect to contribute a portion of their wages up to the federally-regulated dollar maximum per calendar year. As of the Petition Date, the Debtor does not believe it owes any prepetition amounts in connection with the 401(k) Plan. Out of an abundance of caution, the Debtor requests authority to pay any amounts outstanding for prepetition 401(k) obligations.

d.    Insider Compensation

115.    Two of the Debtor's Employees are insiders, myself and my father Michael Hoelzeman. We are both full time, salaried Employees of the Debtor. I am the Debtor's Vice President, with an annual gross salary of $200,000. My father is the Debtor's President, with an annual gross salary of $218,400. We share responsibility for managing the Debtor's day-to-day operations, customer relations, and overseeing the Debtor's financial affairs. We are essential Employees, and our salaries are reasonable given our respective responsibilities.

116.    The Debtor seeks the authority of the Court to continue its existing compensation and benefits structure, and further seeks authority to pay and honor all Employee Obligations, including both Employee Compensation and Employee Deductions, as well as all Employee Benefits.

**F.    Application to Employ Sugar Felsenthal Grais & Hammer as Attorneys**

117.    The Debtor is requesting that the Court enter an order allowing the Debtor to employ Sugar Felsenthal Grais & Hammer ("*SugarFGH*") as its attorney for the pendency of this chapter 11 case, retroactive to the petition date.

27

118.    The Debtor retained SugarFGH under an engagement agreement (the "*Engagement Agreement*") effective as of October 6, 2015, under which SugarFGH agreed to represent the Debtor as its proposed restructuring counsel, in determining the need for, preparing for, filing, and in the course of, this chapter 11 case.

119.    The Debtor believes that its continued representation by SugarFGH in this case is particularly appropriate because of SugarFGH's familiarity with the Debtor, its business and capital structure, and because SugarFGH's insolvency professionals have extensive experience in the area of debtor and creditor rights and remedies, insolvencies and reorganizations in general, and under the Bankruptcy Code in particular.

120.    The Debtor contemplates that SugarFGH will provide a full range of services required to represent it in the course of this chapter 11 case, including:

(a) advising the Debtor with respect to its powers and duties as a debtor-in-possession in the continued management and operation of its business and property;

(b) attending meetings and negotiating with creditor representatives and other parties in interest, and advising and consulting on the conduct of this chapter 11 case, including all of the legal and administrative requirements of operating in chapter 11;

(c) taking all appropriate action to protect and preserve the Debtor's assets, including prosecuting actions on behalf of the Debtor's estate, defending actions commenced against the Debtor's estate, negotiating any litigation in which the Debtor may be involved, and objections to claims filed against the Debtor's estate;

(d) preparing motions, applications, answers, orders, reports, papers and other pleadings necessary to administer the Debtor' estate;

(e) preparing and consummating a sale of substantially all of the Debtor's assets under § 363 of the Bankruptcy Code or a plan of reorganization, and all related agreements and documents, and taking any necessary action on behalf of the Debtor to obtain confirmation of such plan;

(f) appearing before the Bankruptcy Court or other courts to assert or protect the interests of the Debtor and its estate; and

(g) performing any other necessary legal tasks in connection with this chapter 11 case.

121.    I believe that it is essential that the Debtor retain SugarFGH as its attorneys to guide it through this chapter 11 case.

**G.    Application to Employ KCP Advisory Group as Financial Advisor**

122.    The Debtor is requesting that the Court enter an order allowing the Debtor to employ KCP Advisory Group ("*KCP*") as its financial advisor for the pendency of this chapter 11 case.

123.    The Debtor seeks to retain KCP as its financial advisor because of KCP's extensive experience with distressed businesses and chapter 11 bankruptcies, representing both debtors and creditors in distressed situations. KCP has significant experience rendering professional insolvency services, and the Debtor believes KCP is qualified to advise it in this chapter 11 case.

124.    The Debtor retained KCP to provide it financial advisory services under a retention agreement (the "*KCP Retention Agreement*"), dated as of October 29, 2015, under which KCP agreed to provide certain financial advisory services to the Debtor, including the potential preparation for and filing of this chapter 11 case.

125.    The Debtor contemplates that KCP may provide the following services in this chapter 11 case, including:

(a) reviewing historical, current, and projected financial information;

(b) overseeing any proposed sale of the Debtor's assets;

(c) preparing necessary financial or accounting reports and documents on behalf of the Debtor, including its schedules, statement of financial

affairs, and monthly operating reports;

(d) providing assistance and advice concerning the operation of the Debtor in this chapter 11 case;

(e) negotiating with the Debtor's creditors, including resolution of claims and claim disputes;

(f) providing assistance and advice concerning any investigation of the assets, liabilities, and financial condition of the Debtor that may be required under local, state or federal law;

(g) providing counseling with respect to assuming or rejecting executory contracts and leases, sales of assets, and other bankruptcy-related matters arising from this chapter 11 case;

(h) performing any other financial or accounting consulting services as may be necessary and appropriate for the efficient and economical administration of this chapter 11 case; and

(i) providing testimony on behalf of the Debtor in connection with any of the foregoing services.

126.    Given the extent and complexity of the Debtor's business and liabilities, I believe that it is essential that the Debtor retain KCP as its financial advisor to assist it in maximizing the value of its assets under a chapter 11 plan, or by a sale of its assets.

**H.    Application to Employ Ordinary Course Professionals**

127.    The Debtor is requesting that the Court enter an order allowing the Debtor to employ various professionals, including attorneys, among others, in the ordinary course of business (each professional, and "*OCP*" and, collectively, the "*OCPs*") to assist it throughout the pendency of this chapter 11 case.

128.    The Debtor proposes retaining each OCP (subject to each OCP filing and serving a declaration of disinterestedness, substantially in the form attached here as *Exhibit B*) and pay, without formal application to the Court by any OCP, 100% of the OCP's postpetition fees and disbursements incurred by the OCP retained by the Debtor once the OCP: (a) files a declaration

of disinterestedness in this Case; and (b) submits an appropriate invoice to the Debtor describing the nature of the postpetition services rendered.

129.    The Debtor further proposes that each OCP's fees, excluding costs and disbursements, be capped at individualized monthly levels (each an "*OCP Fee Cap*"), while this Case is pending.

130.    The Debtor also requests that the Court authorize it to, in its sole discretion, provide reasonable prepayments to OCPs, in amounts not to exceed the OCP Fee Cap, once an OCP files and serves its declaration of disinterestedness in this Case. Any OCP who receives a prepayment shall agree that the OCP will (a) only apply a prepayment in accordance with the orders of this Court; and (b) promptly return any unapplied and unearned prepayment to the Debtor, immediately upon request by the Debtor.

131.    The Debtor also proposes that, if an OCP's fees for a given month, excluding costs and disbursements, exceed the OCP Cap, the OCP may request payment of the fees exceeding the OCP Cap under the following procedures:

a. The OCP seeking payment over the amount of the OCP Cap shall submit a monthly statement (a "*Monthly Statement*") to the following parties (the "*Notice Parties*"): (i) counsel for the Debtor; (ii) counsel for the Debtor's secured lender; (iii) the Office of the U.S. Trustee; and (iv) counsel for any official committee appointed in this Case.

b. A Monthly Statement must be submitted to the Notice Parties by the end of the last day of the month following the month for which the OCP seeks compensation.

c. A Monthly Statement must include a reasonably detailed invoice, indicating the nature of the services rendered by the OCP, with fees and expenses calculated according to the OCP's standard billing practices.

d. The Notice Parties will have 20 days from the time they are served with a Monthly Statement to object to the fees requested.

31

132.    The Debtor submits that this process is necessary to avoid any disruption in the professional services required for its day-to-day business operations, and ensures that OCP's fees and expenses are monitored effectively.

133.    The continued retention and compensation of the OCPs is in the best interests of the Debtor's estate, creditors, and other parties in interest. The Debtor acknowledges that even though some OCPs may wish to continue to represent and provide work to the Debtor on an ongoing basis, others may be unwilling to do so if the Debtor cannot pay them on a regular basis. Without the background knowledge, expertise and familiarity the OCPs have with the Debtor and its operations, the Debtor would be forced to incur additional and unnecessary expenses, identifying, retaining, and educating replacement professionals unfamiliar with the Debtor's business and financial operations. And further, the Debtor's estate and the interests of creditors are best served by avoiding any disruption in the professional services required for its day-to-day business operations.

134.    I believe that: (a) retaining the OCPs is necessary for its day-to-day business operations; (b) OCP expenses will be monitored carefully; and (c) the OCPs will not perform substantial bankruptcy-related services without filing an application with this Court for separate retention as a non-ordinary course professional.

135.    Although some of the OCPs may hold insubstantial claims against the Debtor for prepetition services rendered to the Debtor, I do not believe that any of the OCPs hold any interest materially adverse to the Debtor, their creditors, or other parties in interest. In any event, the OCP Procedures include a requirement that OCPs file declarations of disinterestedness before an OCP may be compensated. By this Motion, the Debtor is not requesting authority to pay prepetition amounts owed to OCPs.

136.   I believe that the relief sought in this Motion provides the most efficient and practical means of retaining the OCPs when compared to the significant costs of preparing retention applications, orders, and interim and final fee applications for each individual OCP, whose fees will be relatively modest.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: December 2, 2015                     By: _Erik Hoelzeman_

Name: Eriksen Hoelzeman

Title: Vice President of Agri-Fine, Inc.